POIRIER *v.* BARTLETT LUMBER CO.

1. Master and Servant — Negligence — Personal Injuries—Appliances.

> Where plaintiff and his fellow-servants were employed in raising the supports for a tramway, and the master had provided a derrick to be used in raising the supports, but the workmen used pike poles instead and the timbers slipping from their control fell upon plaintiff, the master was not liable, and a verdict was properly directed for defendant on the ground that, having provided the appropriate appliances and pointed out a safe method of performing the wrrk, the employer had performed his duty.[1]

2. Same—Warning Servant..

> Nor was there any room for the claim that the employer was negligent in failing to warn plaintiff of the danger, in the absence of evidence that the defendant or some person in the relation of *alter ego* knew of the workmen doing the work in the manner charged, or that they would be liable to do it in that way.

3. Same—Safe Place—Assumed Risk.

> Nor was the defendant liable for failing to provide a safe place to work, where plaintiff claimed he slipped on ice which was covered with snow, and was unable to escape from under the descending timber; accumulations of ice due to normal weather conditions being known to plaintiff and his coemployees, and the danger being obvious.

Error to Chippewa; Fead, J. Submitted June 2, 1914. (Docket No. 2.) Decided October 3, 1914.

Case by Napoleon Poirier against the Bartlett Lumber Company for personal injuries. Judgment for defendant on a directed verdict. Plaintiff brings error. Affirmed.

---

[1] As to the liability for negligence of coservant in failing to use the instrumentalities furnished by the master, see note in 54 L. R. A. 122.

*F. T. McDonald,* for appellant.

*Davidson & Hudson,* for appellee.

STONE, J.   This is an action on the case, in which the plaintiff seeks to recover damages for a personal injury sustained by him on March 19, 1912, while in the employ of the defendant, and while engaged in assisting to erect or widen a tramway at the sawmill of the defendant.   The plaintiff at the time of the injury was about 24 years of age.   After being engaged in sailing for some years, he had worked in Canada at carpenter work for about two years before coming to this country, in 1908.   He had worked about a year around the Soo at what he termed "heavy work," and had assisted in building a stone crusher plant for the Great Lakes Dredge & Dock Company, which was much the same kind of construction as the tramway upon which he was working when he was injured.   He had also worked upon a tramway for McArthur Bros. about two years before the accident here involved.

Plaintiff began to work for the defendant early in November, 1911.   He first worked at carpenter work on a house of defendant, and was employed at this work until about December 15, 1911, when it was finished, and he then went to work at the sawmill, doing carpenter work.   He worked about two weeks at the mill, assisting in constructing the first tramway. The large timbers used as vertical supports in constructing this first tramway were raised by the use of a derrick, or gin pole.   Plaintiff did not have anything to do with the actual raising of these timbers for this first tramway.   His work consisted in nailing the cross-pieces on the top.   He saw them use the derrick. A Mr. Belleau was in charge of the carpenters building the houses, and directed the work in constructing the second tramway.   After two weeks' working at the

mill, plaintiff went back to work on a house, and continued working there until March 16 or 17, 1912. He was then directed by Belleau to go with him to work at the mill on the construction of the second tramway, or extension. He went down and worked with three others and Mr. Belleau. He first started shoveling snow, and worked at this two or three days, receiving instructions from Belleau. The snow was about two feet deep. Plaintiff helped shovel the snow for the next part of the tramway, to lay the block foundations for the widening of this tramway. This was done by shoveling away a couple of feet of snow, which up to this time had not been disturbed. This work was done by plaintiff and three other men. When the work started the ground was somewhat frozen, but not hard. Some days it was soft and some hard, depending upon the weather. It became hard after the first. It had thawed a couple or three days before the plaintiff was injured, and was freezing the day of the injury. Under the snow there were some sawdust, slabs, and sand frozen to some depth. Plaintiff testified that he did not know there was any ice under the snow. Some snow was left on the ground, and it was more or less packed down. About 4 o'clock in the afternoon of the day before plaintiff was injured, the raising of heavy timbers used as upright supports for this widening of the tramway was begun. As a foundation for this tramway, timbers were squared on two sides and laid on the ground, resting on two blocks underneath. The snow was cleared away and holes were dug in the ground for these blocks, until a good place to make them fast was found. There were five men engaged in the raising of these timbers, including the plaintiff and Belleau. The latter was giving instructions, and directing the work.

These timbers were raised by pike poles and by

hand, instead of a derrick or gin pole. Belleau ordered the men to put these timbers up by pike pole and hand, as it was too slow to use the derrick, although a derrick was there and could have been used. There was testimony that raising these timbers by use of a derrick was the customary and safe way. These timbers were from 13 to 18 feet long, 16 inches in diameter, heavy, green, peeled Norway timber, frozen hard, and weighed from 1,200 to 1,500 pounds each. Plaintiff was injured at about 4 o'clock in the afternoon of the second day, by the falling of one of these timbers. The method used in raising these timbers was for the five men, including the plaintiff and Belleau, to lift the timber up and put their shoulders under the back end, and raise it as high as they could from the ground, the other end being held on the timber upon which it was to stand, then place a cross-tree made from two 2x6 timbers under it to hold it up, and then all of the men (except one who would take care of the end which was to rest on the block foundation) would jab their pike poles into the timber and push it into an upright position, when it was nailed to crosspieces. The timber that fell on the plaintiff had been raised in this manner, and was nearly in an upright position, when it turned and fell, rolling off from all the hooks at the same time. As soon as the timber started to fall, the plaintiff attempted to get away. He started to run, but slipped and fell, and the timber, falling on him, injured him seriously.

The plaintiff testified that in attempting to get out of the way of the falling timber he pushed his right foot into the snow for a footing, and slipped on the ice underneath the snow. The plaintiff testified that this was the first time he had ever used a pike pole, that he had never seen timbers put up in that way before, and that he was given no instructions and received no warning that this method of

raising timbers was dangerous, or that the timber was likely to fall. There was testimony that previous to the accident there had been some discussion by the men there employed, as to the desirability of using a derrick instead of the pike poles, and that plaintiff, among others, had discussed the idea of quitting if some change was not made. It was undisputed that the derrick was there, and could have been got ready in a very short time.

At the close of the plaintiff's testimony, the trial court directed a verdict for the defendant upon the grounds that the plaintiff and Mr. Belleau were fellow-servants, engaged in the same line of employment, working under the same master, and together; that there was no claim in the case that Mr. Belleau was not a competent servant, or a competent workman, and the mere fact that he had some little authority over the other four men working upon the same job would not take him out of the same class of fellow-servants; that it appeared also that the defendant had furnished a proper appliance and method for doing this work—had furnished a derrick, which, according to the testimony, was safe and proper—that the derrick was accessible and could have been used by the men while doing this work, but that it was rejected, and the method was used by which the plaintiff was injured.

The court also charged the jury as follows:

"In such a case as that the master is not liable for any negligence when he furnishes the proper appliances and proper tools and has pointed out the safe method for those who work at that employment, and if they do not follow the method, but use one of their own, the employer is not liable for negligence.

"It is also claimed that the employer was negligent in not warning the plaintiff. There appears to be no evidence in this case that the defendant, or any person working for the defendant, who would be in the

position of a vice-principal, knew that the plaintiff or his associates were doing the work in the manner in which they were doing it, nor that they would be liable to do it in that way. There is nothing to connect the defendant at all with the improper method or unsafe way in which this work was being done, and it would not be the duty of the employer to warn the plaintiff against a practice which was safe, and which the employer, according to the testimony, would have reason to believe was being followed, and, no knowledge having been brought to the employer, or defendant that the practice followed was unsafe, he could not be under any obligations to warn the plaintiff.

"Now, it is also claimed that the defendant has been negligent in not providing a safe place in which to work. It does not appear that this place became unsafe, if it was unsafe, by reason of any want of care on the part of the defendant. The particular act of negligence claimed in this respect is the matter of the accumulation of ice. But it appears that this particular place had been gone over by the plaintiff, and by his fellow-servants; that any condition existing there must have been known to them, or at least it must have been as well known to them as it was to the defendant. The defendant is not a guarantor of climatic conditions, nor the particular condition of any place which may confront workmen on temporary jobs. If this were a permanent employment, his accountability would be held in a more strict manner than where it is merely a temporary job, outside work, and the particular danger, if there was any danger, arises from climatic conditions. It does not appear, gentlemen, from the undisputed testimony in this case that the defendant has been negligent in any of the respects mentioned in the declaration. Aside from that, it might also be mentioned that the plaintiff is a man of mature years; that he has had considerable experience as a carpenter; that some of this has been on rough construction work such as this particular work, or work similar to it; and that he is a man of at least ordinary intelligence, and, as the methods used upon this occasion have been said to be dangerous, it must be apparent that such danger would be obvious to any man of ordinary intelligence, and he

would be deemed to have assumed the risk of such danger by his contract of employment."

A verdict and judgment for the defendant having been entered, the plaintiff has brought the case here upon writ of error, and error is assigned upon the rulings of the court in admitting certain testimony, and also upon the charge of the court, above set forth.

An examination of the record satisfies us that the trial court did not commit any error in the admission of testimony, and the charge of the court so clearly stated the rules of law that are controlling in the case that a discussion of them is not necessary. The law of the case has been so often stated by us that a reference to the cases is unnecessary.

We find no error in the record, and the judgment of the circuit court is affirmed.

MCALVAY, C. J., and BROOKE, KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.